IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**U.S. DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

MAY 1 1 2022

**FILED/REC'D**
**CLERK OF COURT**

| | |
|---|---|
| UNITED STATES OF AMERICA | INDICTMENT |
| v. | Case No. 22    CR    055    JDP |
| DIDION MILLING, INC., | 18 U.S.C. § 1349 |
| DERRICK CLARK, | 29 U.S.C. § 666(e) |
| SHAWN MESNER, | 18 U.S.C. § 371 |
| JAMES LENZ, | 18 U.S.C. § 1001(a)(3) |
| JOSEPH WINCH, | 18 U.S.C. § 1519 |
| ANTHONY HESS, and | 18 U.S.C. § 1505 |
| JOEL NIEMEYER, | 18 U.S.C. § 981(a)(1)(C) |
| Defendants. | 28 U.S.C. § 2461(c) |

THE GRAND JURY CHARGES:

At times material to this Indictment:

<u>Defendants</u>

1.      Defendant DIDION MILLING, INC. (DMI) operated a corn mill in or around Cambria, Wisconsin. DMI milled corn into flours and similar products, which DMI then shipped to food and beverage manufacturers for use as ingredients.

2.      DERRICK CLARK was the vice president for operations at DMI, beginning in or about June 2015.  CLARK's duties included overall responsibility for the operations of DMI's facilities, including the corn mill.

3.      SHAWN MESNER was the food safety superintendent at DMI, beginning in or about June 2014.  MESNER was responsible for monitoring DMI's compliance with its sanitation program, including adherence to its cleaning schedule.

4.    JAMES "JIM" LENZ was the environmental manager at DMI, from in or about June 2011 until in or about April 2016, at which point LENZ began part-time work as an environmental consultant to DMI. LENZ's duties as the environmental manager included monitoring DMI's compliance with pollution control permit requirements and interacting with third-party environmental auditors and government regulators.

5.    JOSEPH "JOE" WINCH was the environmental coordinator at DMI beginning in or about September 2016.  WINCH's duties included monitoring DMI's compliance with pollution control permit requirements and interacting with environmental regulators.

6.    ANTHONY "TONY" HESS was a day shift superintendent at DMI, from in or about 2013 until on or about March 15, 2017.  As a shift superintendent, HESS supervised day-to-day operations of the mill during his 12-hour shift.

7.    JOEL NIEMEYER was a day shift superintendent at DMI, from in or about May 2014 until on or about May 31, 2017. NIEMEYER supervised day-to-day operations during his 12-hour shift.

<u>General Overview of Dust Management Obligations in Grain Mills</u>

8.    Grain milling generates large amounts of grain dust, which must be effectively managed for food safety and quality, workplace safety, and environmental reasons.  Mill operators are subject to rules and requirements intended to minimize hazards in those areas.  As a food safety and quality matter, mill operators must

develop and implement cleaning schedules to remove grain dust to prevent insect infestations and the growth of foodborne pathogens.  As a workplace safety matter, because grain dust is combustible, mill operators must develop and implement effective cleaning programs to remove dust accumulations from inside a mill in order to prevent dust explosions, and install explosion protection systems on certain devices where dust collects. As an environmental matter, mill operators must operate and maintain pollution control devices that capture dust before it is emitted into the environment as particulate matter, a kind of air pollutant.

## COUNT 1
### (Fraud Conspiracy)

Food Safety and Quality

9.    Paragraphs 1-3, 6, and 7 are incorporated here.

10.    DMI annually sold millions of dollars of milled corn ingredients to food and beverage manufacturing companies.  DMI milled the ingredients at the Cambria facility and shipped them via interstate carrier to its customers.

11.    In order to remain qualified as an ingredient supplier for such companies, DMI was expected to develop and implement a comprehensive "sanitation" program to prevent DMI's products from becoming contaminated with pathogens or metals, infested with insects, or affected by other food safety and quality issues.

12.    A central component of the sanitation program was adhering to a cleaning schedule known as the "master sanitation schedule" (MSS).  DMI's sanitation policies described the MSS logbook as a "major part of our sanitation program," "a record we

show inspectors during audits," and "one of the ways we honor our commitment to food safety and regulatory compliance."

13.     The MSS listed dozens of cleanings that were to occur at minimum frequencies to prevent product contamination. The most frequent tasks—ranging from twice-a-week to twice-a-day—involved inspecting, cleaning, and sanitizing specific pieces of processing equipment to prevent the growth of molds and pathogens.  The MSS also required that grain dust be removed from the floors, equipment, and overheads in the work areas, generally once a week.  Removing dust was necessary for food safety and quality reasons, including to prevent insect infestations.

### The MSS Logbook

14.     The MSS logbook was a physical binder that contained a printout of the MSS.  The logbook listed each of the required cleanings and the specific dates by which the cleanings were supposed to be completed, and contained spaces for workers to document their completion of specific cleanings.

15.     Under DMI's sanitation program, workers were supposed to perform the cleanings as scheduled.  The worker who did the cleaning was supposed to initial and date the MSS logbook in a space provided for that purpose.  A shift superintendent—including HESS or NIEMEYER—was then supposed to "verify" that each cleaning had been performed, and if so, sign and date a "superintendent sign off" entry corresponding to the cleanings.  Finally, the food safety superintendent—MESNER—was supposed to verify that the sanitation procedures had been followed, and if so, sign and date a corresponding "food superintendent sign-off" entry.

16.     DMI's sanitation program included a "Proper Record Keeping at Didion" policy that provided in part:

> All entries must be made at the time the work is performed.
>
> Backdating is strictly prohibited. If a date entry was discovered missing at a later date, it must be signed the current date and a notation entered signifying the error.
>
> Making false entries, including signing for work you did not perform, is grounds for performance counselling.

<u>Food Safety Certification and Audits</u>

17.     Major food and beverage manufacturers that purchased ingredients from DMI expected their ingredient suppliers to obtain and maintain food safety certifications.  Those manufacturers required DMI to provide evidence of certification and related third-party food safety audit reports.

18.     In or about 2013, DMI obtained the Food Safety System Certification 22000 (FSSC). To obtain and maintain its certification, DMI was required to demonstrate compliance with its sanitation program, including adherence to the cleaning schedule set out in the MSS, as evidenced by a completed MSS logbook.

19.     As a condition of DMI's certification, a third-party food safety auditor performed an on-site audit at DMI's mill each year to determine compliance with certification requirements. The FSSC audit procedure included a thorough inspection of the facility for sanitation issues and a review of the MSS logbook and other compliance records.  The FSSC auditor identified any "non-conformances" with DMI's sanitation program and determined if the non-conformance was "minor" or "major."  If any non-

conformances were identified, the FSSC auditor would require DMI to provide an explanation or description of what DMI was doing to prevent a recurrence.

20.    At the end of the audit process, the FSSC auditor generated an audit report that described the compliance records reviewed during the audit, any non-conformances found, and any corrective actions required. The report contained a recommendation of whether to continue DMI's certification.

21.    In addition to requiring proof of DMI's certification, some of DMI's customers directly performed their own sanitation audits. Customer audits included an on-site inspection and a review of the MSS logbook and other records.

<u>The Conspiracy</u>

22.    Beginning on a date unknown to the Grand Jury but no later than on or about June 3, 2014, and continuing through a date unknown to the Grand Jury but at least through on or about November 1, 2017, in the Western District of Wisconsin, and elsewhere, the defendants,

DIDION MILLING, INC.,
DERRICK CLARK,
SHAWN MESNER,
ANTHONY HESS, and
JOEL NIEMEYER,

did knowingly and intentionally conspire and agree with each other and with others to commit:

a.    <u>Interstate Carrier Fraud</u>, that is, having devised and intending to devise any scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by

concealment of material facts, for the purpose of executing such scheme and artifice and attempting so to do, to deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; and

b.    <u>Wire Fraud</u>, that is, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, to transmit and cause to be transmitted by means of wire, communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

Object

23.    The object of the conspiracy was to deceive food safety auditors about sanitation practices so that DMI could continue to sell millions of dollars of milled corn ingredients annually to food and beverage manufacturers.

Manner and Means

24.    It was part of the conspiracy that the defendants and others acting with them engaged in a scheme to defraud by engaging in false and misleading conduct to avoid adverse food safety audit findings so that DMI could sell products.

25.    It was further part of the conspiracy that the defendants made false entries in the MSS logbook, knowing the logbook was reviewed during food safety audits, to

conceal the fact that DMI did not follow its written sanitation schedule.  The false entries included:

      a.     Forged initials of workers to make it appear as if those workers had performed cleanings as scheduled, when they had not;

      b.     Backfilled and backdated "superintendent sign-off" entries to make it appear as if the superintendents had verified cleanings, when they had not; and

      c.     Backfilled and backdated "food safety superintendent sign-off" entries to make it appear as if the food safety superintendent had verified compliance with the MSS procedures, when he had not.

26.     It was further part of the conspiracy that extraordinary cleanings were performed in advance of food safety audits to conceal the fact that the MSS was not being followed.  The extraordinary pre-audit cleaning efforts included:

      a.     Sharing "tour route" information in advance of an audit to indicate which areas of the facility needed to be cleaned,

      b.     Altering and limiting normal operations and temporarily reassigning employees in order to clean, and

      c.     Performing special internal inspections and providing detailed cleaning instructions to make sure that any signs of dust accumulations or insect activity were removed by the time auditors arrived.

27.     It was further part of the conspiracy that the defendants and others acting with them presented the falsified sanitation records, including the MSS logbook, to food safety auditors.

28.      It was further part of the conspiracy that the defendants and others acting with them provided certifications and favorable FSSC audit reports to DMI's customers, including via email, knowing the certifications and reports had been fraudulently obtained through document falsifications and extraordinary pre-audit cleanings.

29.      It was further part of the conspiracy that, based on the false and fraudulent conduct above, DMI remained qualified to supply ingredients to food and beverage manufacturers and continued to deliver ingredients to those manufacturers via interstate carrier in exchange for money paid to DMI.

(In violation of Title 18, United States Code, Section 1349)

## COUNT 2
### (Willful OSHA Violation Causing Death)

30.    Paragraphs 1 and 12 – 16 are incorporated here.

### General Background on Combustible Dust Explosions

31.    Corn and other grains are combustible, meaning they can catch fire. Combustible grain dust refers to fine grain particles that can ignite when a sufficient concentration of the dust is suspended in the air and exposed to an ignition source. When clouds of combustible dust ignite, the resulting flash fire is called a "deflagration." During a deflagration, a flame front in the form of a fire ball rapidly moves through and consumes the dust cloud.

32.    Deflagrations can spread and strengthen if they occur inside a facility where combustible dust has accumulated on floors, equipment, overhead pipes, or other surfaces. Pressure waves from a deflagration can disturb such dust accumulations and throw the accumulated dust into the air, which forms additional clouds of combustible dust.  The new dust clouds can then ignite.  The result can be a succession of dust cloud explosions that propagate through a facility.

### OSHA and the Grain Handling Standard

33.    The Occupational Safety and Health Administration (OSHA) administers and enforces the Occupational Safety and Health Act (OSH Act), 29 U.S.C. § 651 *et seq.*, the purpose of which is to assure safe workplaces for the Nation's workers.  The OSH Act authorizes OSHA to issue workplace safety standards that employers must follow.

34.     In or about 1987, OSHA promulgated a set of safety standards—

collectively known as the Grain Handling Standard—that are applicable to dry corn

mill employers, including DMI.  29 C.F.R. § 1910.272.  A purpose of the Grain Handling

Standard is to prevent grain dust fires and explosions.  29 C.F.R. § 1910.272(a).

35.     "Fugitive dust" is the fine dust that is emitted from a mill's stock handling

system. In mills, pieces of grain are processed inside closed machines and are moved

from machine to machine by closed pipes and conveyors.  Grain dust can escape or

"leak" from the closed systems into general work areas.  Once released, the fugitive

dust floats in the air until it settles on surfaces.

36.     The Grain Handling Standard requires that grain mill operators perform

"housekeeping" to reduce accumulations of fugitive dust that, if left in place, could fuel

the spread of dust deflagrations.  Specifically:

> The employer shall develop and implement a written housekeeping
> program that establishes the frequency and method(s) determined best to
> reduce accumulations of fugitive grain dust from ledges, floors,
> equipment, and other exposed surfaces.

29 C.F.R. § 1910.272(j).

### DMI's Sanitation Program and Combustible Dust

37.     DMI did not develop a written housekeeping program that was

specifically dedicated to preventing combustible dust fires and explosions.  Instead, the

cleaning frequencies and methods used by DMI to remove dust accumulations were set

forth in DMI's written sanitation program, the primary purpose of which was to

operate a sanitary facility for food safety purposes, including by eliminating dust

accumulations as necessary to prevent insect infestations. Under the MSS cleaning schedule, the floors, equipment, walls, and overhead surfaces were generally required to be cleaned of dust at least once a week.

38.　DMI operations and safety managers knew that DMI's sanitation program, as developed, did not establish cleaning frequencies and methods that were determined best to reduce combustible dust accumulations. The managers knew that DMI's program could have included—but did not include—additional housekeeping provisions that were necessary at DMI to protect against dust explosions, including: more frequent cleanings in areas of the facility where dangerous levels of dust tended to quickly accumulate; more specific and practical methods for cleaning hard-to-reach overhead surfaces, including more frequent mill shut-downs to provide workers with a safe opportunity to clean overhead surfaces with compressed air; providing an expanded central vacuum system and portable vacuums to clean accumulations; and increased cleaning frequencies anytime accumulations reached hazardous levels.

39.　In addition to the deficiencies in the written sanitation program as developed, DMI managers knew that the sanitation program was not actually being implemented and that the MSS was not being followed. Managers knew that the weekly cleanings of dust from the walls, equipment, and overhead surfaces in each room in the mill, as were required by the MSS, frequently did not get done.

40.　As a result of DMI's failures to develop and implement an effective dust housekeeping program, the floors, walls, equipment, and overhead surfaces in many

areas of DMI's facility were routinely layered with hazardous accumulations of combustible dust.

### The Five-Fatality Dust Explosion

41.     On or about May 31, 2017, a combustible dust deflagration occurred at DMI's corn mill.  The deflagration originated in milling equipment on the first floor of the B Mill.  Due to fugitive dust accumulations, the deflagration spread throughout the facility.  The walls were blown off of the side of the B Mill, and the C Mill, F Mill, packaging, and warehouse structures collapsed.

42.     On or about May 31, 2017, in the Western District of Wisconsin, the defendant, DIDION MILLING, INC., an employer, willfully failed to develop and implement a written housekeeping program that established the frequency and methods determined best to reduce accumulations of fugitive grain dust on ledges, floors, equipment, and other exposed surfaces, in violation of Title 29, Code of Federal Regulations, Section 1910.272(j), and that violation caused death to employees Duelle Block, Robert Goodenow, Charly Nunez, Angel Reyes-Sanchez, and Pawel Tordoff.

(In violation of Title 29, United States Code, Section 666(e)).

## COUNT 3
### (Willful OSHA Violation Causing Death)

43.    Paragraphs 1, 31-34, and 41 are incorporated here.

### Explosion Protection Systems on Filter Collectors

44.    Filter collectors, also known as baghouses, are devices used to capture and collect dust particles during industrial processes.  Filter collectors are metal boxes that contain fabric filters.  Suction is used to pull dust-laden air into the collector, where the dust particles become lodged in the filters. The cleaned air passes through the filters and exits the collector.  The filters are periodically "pulsed" by jets of compressed air, which knock some of the dust off of the filters and cause it to fall to the bottom.

45.    Under normal operations, filter collectors often present a combustible dust deflagration hazard because they collect dust and suspend it in the air during pulsing in sufficient concentrations to propagate a flame front.  If a dust cloud ignites inside a collector, the rapid rise of internal pressure can cause the sides of the filter collector to rupture and the deflagration to propagate into the general work area.  If that happens, the pressure waves and flame front associated with the spreading deflagration can ignite additional deflagrations.

46.    To prevent that from happening, the OSHA Grain Handling Standard requires that all filter collectors either be located outside the facility or, if located inside, be installed with either (a) explosion venting to the outside or (b) an explosion suppression system.  29 C.F.R. § 1910.272(*l*)(2).

<u>Inside Filter Collectors at DMI's Mill</u>

47.      DMI had at least two dozen filter collectors located inside its mill that were neither vented to the outside nor provided with explosion suppression systems. DMI operations and safety managers knew that explosion protection or venting was required on filter collectors located inside the mill, and they knew that many inside collectors at DMI were non-compliant.

48.      One of the unprotected and unvented filter collectors inside DMI's mill was the coarse grinder filter in the first floor of the B Mill.

<u>The May 31, 2017, Explosion</u>

49.      During the May 31, 2017, explosion, a deflagration occurred inside the coarse grinder filter.  The deflagration blew open the access panel to the filter, allowing the deflagration pressure waves and flame front to escape into the general work area, resulting in the propagation of deflagrations through the building interior.

50.      On or about May 31, 2017, in the Western District of Wisconsin, the defendant, DIDION MILLING, INC., an employer, willfully failed to install an explosion suppression system and an explosion venting system on a filter collector located inside the facility, in violation of Title 29, Code of Federal Regulations, Section 1910.272(*l*)(2), and that violation caused death to employees Duelle Block, Robert Goodenow, Charly Nunez, Angel Reyes-Sanchez, and Pawel Tordoff.

(In violation of Title 29, United States Code, Section 666(e)).

## COUNT 4
**(Conspiracy)**

51.     Paragraphs 1 – 7, 12 – 16, 33 – 36, and 44 are incorporated here.

### Falsification of the MSS Logbook

52.     The purpose of the MSS logbook was to document the completion and verification of scheduled cleanings, including the removal of dust accumulations from floors, walls, equipment, and overhead surfaces.  DMI did not perform all cleanings and verifications as scheduled by the sanitation program.  The MSS logbook was repeatedly falsified to conceal DMI's failure to follow the schedule.

### The Clean Air Act

53.     The Clean Air Act is the Nation's comprehensive air pollution control statute. 42 U.S.C. § 7401 *et seq.*  The purpose of the Act is to "protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1). The Act is administered and enforced by the United States Environmental Protection Agency (EPA), an agency within the executive branch of the United States.

54.     The Clean Air Act directs EPA to identify and set National Ambient Air Quality Standards for the most common air pollutants.  42 U.S.C. § 7409.  EPA has identified and set standards for six "criteria pollutants," including particulate matter, one form of which is grain dust.

55.     The Act delegates to the States the primary responsibility for achieving ambient air quality standards through the development of State Implementation Plans (SIPs).  42 U.S.C. § 7410.  A state's SIP must be approved by the EPA and must include,

among other requirements, a program to regulate the construction or modification of any stationary source to assure that national air quality standards are achieved. 42 U.S.C. § 7410(a)(2)(C).

56.    Under Wisconsin's EPA-approved SIP, the Wisconsin Department of Natural Resources (WDNR) issues permits for the modification and construction of stationary sources. WIS. ADMIN. CODE NATURAL RES. Ch. 406. The WDNR investigates and enforces permit compliance through inspections, records requests, and enforcement actions. WIS. STAT. §§ 285.83 & 285.87.

57.    All terms and conditions in a WDNR-issued construction permit are federally enforceable by the EPA, unless specifically designated as not federally enforceable. WIS. ADMIN. CODE NATURAL RES. § 406.075.

<u>Baghouse Pressure Drop Monitoring</u>

58.    DMI's corn mill was a stationary source for purposes of the Clean Air Act permitting requirements. Beginning in or about the 2000s, and continuing at times material to the indictment, WDNR issued to DMI a series of construction permits (hereinafter "the air permits") as DMI expanded and modified its facility. The air permits were federally enforceable.

59.    The air permits required that DMI operate baghouses (also known as filter collectors) to limit particulate matter (grain dust) emissions. Baghouses are part of a facility's larger dust collection system. Dust collection systems use suction to pull fine dust particles into pipes that carry the dust-laden air to a baghouse. Inside the

baghouse, the dust-laden air is pulled by suction across the filters, which trap the dust and allow the cleaned air to pass through and be emitted to the environment.

60.    "Pressure drop" is a measurement of the difference in air pressure between the incoming air stream on the dirty side of a baghouse and the outgoing air stream on the clean side.  Pressure drop readings that are low may indicate a possible malfunction or filter tear allowing particulate matter to pass through the baghouse into the environment. Conversely, high pressure drop readings can indicate that the dust collection system is not collecting dust as intended.

61.    The air permits required DMI to monitor and record the pressure drop on each of approximately 14 baghouses every eight hours. The permits established an acceptable pressure drop range for each baghouse and required DMI to take corrective measures whenever a pressure drop reading was out of range.  DMI created an electronic spreadsheet (the "baghouse log") to record the pressure drop readings.

<u>Falsification of the Baghouse Log</u>

62.    The baghouse log was routinely falsified by entering false pressure drop entries to conceal missed and out-of-range readings.  When the observed pressure drop on a baghouse was below the permitted range, a false number—typically "2" inches of water column—was entered into the log.  When the observed pressure drop was above range, a false number—typically "8" inches of water column—was entered.  Blank entries were backfilled with false pressure drop entries—typically "2" or "8"—weeks or months after the fact.

Compliance Certifications and Deviation Summary Reports

63.     The air permits required DMI to submit a periodic monitoring report to WDNR every six months that contained a summary of any deviations from permit conditions.  All deviations and violations were to be clearly identified in the report. WIS. ADMIN. CODE NATURAL RES. § 439.03(1)(c).  The permits also required DMI to submit annual certifications of compliance that disclosed deviations and violations.

64.     The monitoring reports and compliance certifications had to be certified by a "responsible official" as to the truth, accuracy, and completeness of the report, based on information and belief formed after reasonable inquiry.  A "responsible official" included a corporate vice-president in charge of a principal business function or other person performing similar policy or decision-making functions for the corporation.  WIS. ADMIN. CODE NATURAL RES. § 400.02(136).

Court-Ordered Environmental Compliance Audits and Reporting

65.     Beginning or about 2010, DMI was ordered by a court to submit to annual, third-party environmental compliance audits until in or about 2015.  The court order required DMI to provide to WDNR an audit report for each annual third-party audit. The report had to include a description of all violations revealed by the audit, the length of time the violations may have continued, and a description of actions taken or proposed to be taken to correct the violations.

2017 WDNR Compliance Inspection

66.     On or about May 17, 2017, WDNR began an inspection of DMI's compliance with its air permits. The inspection included an on-site document review

and facility inspection and subsequent records requests. The inspection continued until on or about November 10, 2017.

### OSHA Investigation of the Five-Fatality Explosion in 2017

67.    OSHA is authorized to perform workplace inspections and investigations to carry out its mission of enforcing compliance with the OSH Act and improving workplace safety. 29 U.S.C. § 657. OSHA can issue citations and seek civil money penalties to employers for violations of the OSH Act. 29 U.S.C. §§ 658, 666. OSHA can impose higher money penalties if an employer's violation is "willful," 29 U.S.C. § 666(a), and a willful violation of a safety standard that causes death to an employee is a crime. 29 U.S.C. § 666(e).

68.    From on or about June 1 until on or about November 17, 2017, OSHA investigated the May 31, 2017, explosion at DMI's mill.

### Testimony of HESS

69.    On or about September 22, 2017, HESS gave sworn testimony to OSHA as part of OSHA's pending investigation. In the course of his testimony, HESS falsely and misleadingly testified that the MSS cleaning schedule was actually followed; that he would only sign the MSS logbook if he had indeed verified that the cleanings had been timely performed; and that, if any cleanings were not timely performed, a notation would be made in the MSS logbook reflecting that fact.

70.    In truth and in fact, HESS knew that many cleanings were not completed as scheduled and that, contrary to his testimony that any missed cleanings would be

notated as such in the MSS logbook, HESS and others simply backfilled and backdated the logbook with false entries to make it appear as though all cleanings had been done.

### Testimony of CLARK

71.    On or about September 29, 2017, CLARK gave sworn testimony to OSHA as part of OSHA's pending investigation. In his testimony, CLARK made deliberately false and misleading statements to OSHA about the MSS logbook. CLARK falsely and misleadingly denied knowledge of any problems with completing the MSS logbook and denied having seen the logbook before.

72.    In truth and in fact, CLARK knew that the MSS logbook was regularly backfilled to eliminate blank entries, including in advance of audits by third-parties.

### The Conspiracy

73.    Beginning on a date unknown to the Grand Jury but no later than on or about March 25, 2013, and continuing through a date unknown to the Grand Jury but at least through on or about February 8, 2018, in the Western District of Wisconsin, and elsewhere, the defendants,

DIDION MILLING, INC.,
DERRICK CLARK,
SHAWN MESNER,
JAMES LENZ,
JOSEPH WINCH,
ANTHONY HESS, and
JOEL NIEMEYER,

did knowingly and intentionally conspire and agree with each other and with others to commit the following offenses against the United States:

a.    <u>Making and Using a False Writing and Document</u>, that is, to knowingly and willfully make and use a false writing and document, knowing the same to contain any materially false, fictitious, and fraudulent statement and entry, in matters within the jurisdiction of OSHA and the EPA, agencies of the executive branch of the United States Government, in violation of Title 18, United States Code, Section 1001(a)(3);

b.    <u>Falsifying a Document in Relation to a Federal Investigation</u>, that is, to knowingly alter, conceal, cover up, falsify, and make a false entry in any record and document, with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of OSHA and the EPA, agencies of the United States, and in relation to and contemplation of any such matter, in violation of Title 18, United States Code, Section 1519; and

c.    <u>Obstructing an Agency Proceeding</u>, that is, corruptly and intentionally influencing, obstructing, impeding, and endeavoring to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding is being had before OSHA, an agency of the United States, in violation of Title 18, United States Code, Section 1505.

<u>Object of the Conspiracy</u>

74.    The object of the conspiracy was to conceal violations and unsafe conditions from auditors and government agencies.

22

<u>Manner and Means</u>

75.     It was part of the conspiracy that the defendants and others working with them and at their direction made and submitted false and fraudulent documents and gave false and fraudulent testimony to and in relation to OSHA and the EPA.

76.     It was further part of the conspiracy that DMI, CLARK, MESNER, HESS, NIEMEYER, and others working with them and at their direction caused false entries to be made in the MSS logbook.

77.     It was further part of the conspiracy that DMI, by and through its employees and agents, submitted the falsified MSS logbook to OSHA.

78.     It was further part of the conspiracy that DMI, CLARK, LENZ, HESS, NIEMEYER, and others working with them and at their direction falsified the pressure drop entries in the baghouse log.

79.     It was further part of the conspiracy that DMI, CLARK, and LENZ presented the falsified baghouse logs to the third-party environmental auditor.

80.     It was further part of the conspiracy that DMI provided fraudulently obtained third-party environmental audit reports to WDNR to make it appear as though DMI complied with its air permits.

81.     It was further part of the conspiracy the DMI, CLARK, and WINCH presented and submitted the falsified baghouse logs to WDNR inspectors.

82.     It was further part of the conspiracy that DMI, CLARK, LENZ, and WINCH filed false certifications of compliance and deviation summary reports with WDNR that intentionally omitted known violations from required disclosures.

83.    It was further part of the conspiracy that CLARK and HESS gave false and misleading testimony to OSHA to conceal DMI's combustible dust-related violations and the falsification of the MSS logbook.

### Overt Acts

84.    In furtherance of the conspiracy, and to accomplish its objectives, the following overt acts were committed in the Western District of Wisconsin and elsewhere:

85.    **Overt Act Number 1:** On or about March 25, 2013, LENZ wrote an email to mill managers informing them that the annual third-party environmental audit would be occurring on April 3 and 4, 2013.  LENZ attached a list of the records that the auditor would be reviewing and asked that the records be brought up to date. LENZ explained that he would be printing paper copies of the records for the audit because "I do not want to show computer records because it is too easy to search for bad records."

86.    **Overt Act Number 2:** On or about August 4, 2014, MESNER wrote an email to the mill superintendents, including HESS and NIEMEYER, reporting that there were numerous blank entries in the July 2014 MSS logbook.  MESNER wrote "a more serious problem is why tasks are not being completed," "all tasks that are on the MSS need to be completed as scheduled," and "this has been an on-going problem and needs to be addressed." With the understanding that the superintendents would backfill the MSS logbook to fill in the blank entries, MESNER wrote "The MSS [logbook] has been placed on the Superintendents desk for revisions."

87. **Overt Act Number 3:** On or about October 6, 2014, MESNER sent an email to NIEMEYER and others regarding the fact that NIEMEYER had written and initialed "task not completed" in the July 2014 MSS logbook for approximately 300 different entries. MESNER wrote that the "task not completed" entries were not acceptable. MESNER further set a meeting to "review the July MSS and discuss[] our options that would allow compliance of [*sic*] our FSSC 22000 certification." The agenda for the meeting included "options to fix" the July 2014 MSS logbook.

88. **Overt Act Number 4:** On or after October 6, 2014, NIEMEYER altered the approximately 300 "task not completed" entries in the July 2014 MSS logbook. For each entry, NIEMEYER inserted a footnote that falsely stated "Superintendent verified tasks were completed on this date," followed by the dates in July 2014 by which the cleaning verifications had originally been due.

89. **Overt Act Number 5:** On or about April 16, 2015, LENZ submitted the annual third-party environmental audit report to WDNR.

90. **Overt Act Number 6:** On or about February 12, 2016, LENZ emailed the December 2015 baghouse log—which contained about 130 blank entries that were shaded red—to HESS, NIEMEYER, CLARK, and others. LENZ wrote "I need the red areas filled in and sent back to me."

91. **Overt Act Number 7:** On or about March 14, 2016, LENZ sent an email to HESS, NIEMEYER, CLARK, and others identifying at least 36 blank baghouse log entries from February and March 2016, so that the blank entries would be backfilled.

92.    **Overt Act Number 8:**  On or about May 18, 2016, CLARK emailed HESS, NIEMEYER, and others and said "We have an environmental audit that is scheduled for week after next." With the understanding that blank entries would be filled in, CLARK wrote "I just need everyone to make sure they are all up to date" on required environmental compliance monitoring inspections and "ensure our documentation is up to date and fully complete."

93.    **Overt Act Number 9**: On or about October 19, 2016, MESNER emailed NIEMEYER and others directing them to "bring the MSS book up-to-date" because it would be looked at during a food safety audit the next day and to leave the logbook on MESNER's desk "once completed."

94.    **Overt Act Number 10**:  On or about December 1, 2016, MESNER emailed HESS, NIEMEYER, and others about the MSS logbook, stating that the "majority of the scheduled daily, semi-weekly, weekly, semi-monthly, and monthly tasks were not completed and there has been no Superintendent Sign-Offs."  MESNER wrote "This is not acceptable.  We have upcoming visits from [two food and beverage manufacturing customers] in the next week." With the understanding that the superintendents would backfill the blank entries, MESNER wrote "I have left the MSS on the Super[intendent]s desk."

95.    **Overt Act Number 11:** On or about January 27, 2017, with the understanding that the superintendents would backfill the blank entries, MESNER emailed HESS, NIEMEYER, CLARK, and others stating that the "normal missing tasks and superintendent sign-offs are present" in the MSS logbook.

96. **Overt Acts Number 12:** In or about January 2017, HESS signed off on falsified weekly cleaning entries in the MSS logbook for the week of January 1-7, 2017.

97. **Overt Acts Number 13:** In or about January 2017, NIEMEYER signed off on falsified semi-weekly cleaning entries in the MSS logbook for the periods ending January 11 and 15, 2017, and weekly cleaning entries for the week of January 8-14, 2017.

98. **Overt Act Number 14:** In or about January or February 2017, MESNER signed off on falsified semi-weekly cleaning entries in the MSS logbook for the periods ending January 11 and 15, 2017; and falsified weekly cleaning entries for the weeks of January 1-7 and January 8-14, 2017.

99. **Overt Act Number 15:** In or about February 2017, HESS signed off on falsified semi-weekly cleaning entries in the MSS logbook for the periods ending February 5 and 8, 2017.

100. **Overt Act Number 16:** In or about February 2017, MESNER signed off on falsified semi-weekly cleaning entries in the MSS logbook for the periods ending February 5 and 8, 2017.

101. **Overt Act Number 17:** On or about February 10, 2017, in a submission to WDNR, CLARK falsely certified as a "responsible official" that DMI complied with the baghouse monitoring requirements of its permit from January 1 to December 31, 2016.

102. **Overt Act Number 18:** On or about March 6, 2017, MESNER emailed HESS, NIEMEYER, and others that "the Master Sanitation Schedule is in need of attention. Majority of late month February tasks have not been completed, or at least not

signed off by either employee and/or Superintendent. Please complete as soon as possible."

103.    **Overt Act Number 19:** In or about March 2017, NIEMEYER signed off on falsified weekly cleaning entries in the MSS logbook for the week of March 22-31, 2017.

104.    **Overt Act Number 20**: In or about March 2017, MESNER signed off on falsified weekly cleaning entries in the MSS logbook for the weeks of March 1-7 and March 22-31 2017, and falsified semi-monthly entries for the period March 1-15, 2017.

105.    **Overt Act Number 21:** On or about May 17, 2017, WINCH displayed to WDNR inspectors the 2017 baghouse log, which WINCH knew contained false pressure drop data, without disclosing the falsity of the record.  CLARK was present for WDNR's review of the baghouse log, which he also knew to contain false data.

106.    **Overt Act Number 22:**  On or about May 19, 2017, MESNER sent an email to NIEMEYER, and others that identified blank entries in the MSS logbook and stated that the blank entries were "unacceptable and not up to audit standards" and needed to be addressed "with the utmost importance as the FSSC audit is approaching."

107.    **Overt Act Number 23:** On or about May 19, 2017, MESNER signed off on falsified weekly cleaning entries in the MSS logbook for May 1-7, 2017.

108.    **Overt Act Number 24**: On or about August 14, 2017, CLARK signed a compliance certification and deviation summary report for the period January 1 to June 30, 2017, knowing that it did not disclose that the baghouse log was falsified during that period.

109.    **Overt Act Number 25**:  On or about August 14, 2017, WINCH sent WDNR the compliance certification and deviation summary report for January 1 to June 30, 2017, knowing they failed to disclose the baghouse log falsifications.

110.    **Overt Act Number 26**: On or about August 16, 2017, WINCH sent to WDNR the baghouse logs for 2015, 2016, and 2017, which contained false entries.

111.    **Overt Act Number 27**:  On or about August 24, 2017, DMI sent to OSHA the MSS logbook for 2017, which contained false entries.

112.    **Overt Act Number 28**:  On or about September 22, 2017, HESS falsely and misleadingly testified about the MSS logbook during an OSHA proceeding.

113.    **Overt Act Number 29**:  On or about September 29, 2017, CLARK falsely and misleadingly testified about the MSS logbook during an OSHA proceeding.

114.    **Overt Act Number 30:** On or about February 8, 2018, CLARK, as a "responsible official" for DMI, signed a compliance certification and deviation summary report for the period January 1 to December 31, 2017, knowing that it failed to make a required disclose that DMI had falsified the baghouse log during that period.

115.    **Overt Act Number 31**: On or about February 8, 2018, WINCH submitted to WDNR the compliance certification and deviation summary report for the period January 1 to December 31, 2017, knowing that it did not disclose the fact that DMI had falsified the baghouse log during that period.

(All in violation of Title 18, United States Code, Section 371)

## COUNT 5
### (Document Falsification in Contemplation of Federal Investigation)

116.     Paragraphs 1, 2, 5, and 53 – 64 are incorporated here.

117.     On or about August 14, 2017, CLARK, as a "responsible official" for DMI, signed a compliance certification and deviation summary report for the period January 1 to June 30, 2017, knowing that it failed to disclose that DMI had falsified the baghouse log during that period.

118.     On or about August 14, 2017, WINCH submitted the compliance certification and deviation summary report to WDNR on behalf of CLARK and DMI, knowing that it failed to disclose that DMI the falsification of the baghouse log.

119.     On or about August 14, 2017, in the Western District of Wisconsin, the defendants,

DIDION MILLING, INC.,
DERRICK CLARK, and
JOSEPH WINCH,

knowingly falsified, and made a false entry in, and aided and abetted the falsification and making of a false entry in, a record and document, to wit, the August 14, 2017, environmental compliance certification and deviation summary report, with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of the EPA, an agency of the United States, and in relation to and contemplation of any such matter.

(In violation of Title 18, United States Code, Sections 1519, 2)

## COUNT 6
### (False Entries in Record Within EPA's Jurisdiction)

120.    Paragraphs 1, 2, 4 – 7, 53 – 62, and 66 are incorporated here.

121.    On or about August 16, 2017, WINCH sent to WDNR the baghouse logs for 2015, 2016, and 2017, which contained thousands of false pressure drop entries.

122.    On or about August 16, 2017, in the Western District of Wisconsin, the defendants,

DIDION MILLING, INC.,
DERRICK CLARK,
JAMES LENZ,
JOSEPH WINCH,
ANTHONY HESS, and
JOEL NIEMEYER,

knowingly and willfully made and used, caused to be made and used, and aided and abetted the making and use of a false writing and document, to wit: the DMI baghouse logs for 2015, 2016, and 2017, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in matters within the jurisdiction of the EPA, an agency of the executive branch of the Government of the United States.

(In violation of Title 18, United States Code, Sections 1001(a)(3) & 2)

## COUNT 7
### (False Entries in Record Within OSHA's Jurisdiction)

123.    Paragraphs 1 – 3, 6, 7, 12 – 16, 31 – 36, 52, 67, and 68 are incorporated here.

124.    On or about August 24, 2017, DMI sent to OSHA the MSS logbook for 2017, which contained hundreds of falsified entries.

125.    On or about August 24, 2017, in the Western District of Wisconsin and elsewhere, the defendants,

DIDION MILLING, INC.,
DERRICK CLARK,
SHAWN MESNER,
ANTHONY HESS, and
JOEL NIEMEYER,

knowingly and willfully made and used, caused to be made and used, and aided and abetted the making and use of a false writing and document, to wit: the 2017 MSS logbook, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in matters within the jurisdiction of OSHA, an agency of the executive branch of the Government of the United States.

(In violation of Title 18, United States Code, Sections 1001(a)(3) & 2)

## COUNT 8
### (Obstruction of Agency Proceeding)

126.    Paragraphs 6, 12 – 16, 31 – 36, and 67 – 70 are incorporated here.

### The Charge

127.    On or about September 22, 2017, within the Western District of Wisconsin, the defendant, ANTHONY HESS, corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before OSHA, an agency of the United States.

(In violation of Title 18, United States Code, Section 1505)

## COUNT 9
### (Obstruction of Agency Proceeding)

128.    Paragraphs 1, 2, 12 – 16, 31 – 36, 67, 68, 71, and 72 are incorporated here.

129.    During his September 29, 2017, testimony to OSHA, CLARK made deliberately false and misleading statements about, among other things: the MSS logbook, prior fires at DMI's corn mill, prior tours of the mill related to combustible dust hazards, and dust collection and housekeeping problems in the pack area.

130.    CLARK falsely and misleadingly denied knowledge of prior fires at DMI's mill other than the May 31, 2017, explosion and a fire occurring on May 29, 2017.  In truth and in fact, CLARK knew about other fires; had participated in "root cause analysis" meetings after prior fires; and knew that a prior fire had been caused by the accumulation of combustible dust.

131.    In the course of his testimony, CLARK falsely and misleadingly denied that he toured the mill to look for safety problems. In truth and in fact, CLARK repeatedly participated in tours that revealed problems with dust collection systems and dust accumulations in the pack area and fugitive dust leaks and accumulations in the mill buildings.

132.    CLARK falsely and misleadingly testified that he was unaware of problems with the dust collection system in the pack area and denied that a proposed capital expenditure project for the year 2017 titled "Combustible Dust Pack 1 & 2" had to do with the dust collection problems on Line 1 and Line 2. In truth and in fact, Clark knew that dangerous levels of dust regularly developed in the pack area and that the

purpose of the proposed capital expenditure project was to correct the dust collection problems on the packing lines.

<u>The Charge</u>

133.    On or about September 29, 2017, within the Western District of Wisconsin, the defendants, DIDION MILLING, INC., and DERRICK CLARK, corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before OSHA, an agency of the United States.

(In violation of Title 18, United States Code, Section 1505)

## FORFEITURE NOTICE

134.     Upon conviction of the offense of conspiracy to commit fraud in violation of Title 18, United States Code, Section 1349, set forth in Count 1 of this indictment, the defendant, DIDION MILLING, INC., shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including but not limited to a sum of money equal to the proceeds derived from the offense.

135.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant-cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

PRESIDING JUROR
Indictment returned: 05-11-2022

SAMUEL CHARLES LORD
Trial Attorney, U.S. Department of Justice

36